UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHELLE MAZZARO,<br><br>               Plaintiff,<br><br> -against-<br><br><br>CULTURAL CARE, INC.<br>d/b/a CULTURAL CARE AU PAIR,<br>EF EDUCATION FIRST, INC.,<br>EF INTERCULTURAL FOUNDATION, INC. &<br>KRISTEN TANNER,<br><br>               Defendants. | Civil Action No.:<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL REQUESTED** |

Plaintiff Michelle Mazzaro, by and through her counsel Carabba Law Firm P.C., as and for her Complaint against Cultural Care, Inc. d/b/a Cultural Care Au Pair ("CCAP"), EF Education First, Inc. ("EF"), EF Intercultural Foundation Inc. and Kristen Tanner (collectively, "Defendants") alleges upon knowledge of her own acts and upon information and belief as to all other matters, as follows:

**NATURE OF CLAIM**

1. Plaintiff brings this action in response to Defendants' unlawful interference with the exercise of her rights, and discrimination and retaliation against her for such exercise, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. (the "FMLA") and for perceived and actual disability discrimination in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290, et seq., (the "Human Rights Law") and for aiding and abetting perceived and actual disability discrimination in violation of the Human Rights Law.  Plaintiff seeks compensatory and punitive damages, liquidated damages, attorneys' fees and other

appropriate relief pursuant to the FMLA and Human Rights Law. In addition, Defendants violated the New York State Labor Law by failing to provide Plaintiff with the information required by the Wage Theft Prevention Act, thereby entitling Plaintiff to additional damages.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over Plaintiff's FMLA claims pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. § 1331.

3.     This Court may assert supplemental jurisdiction over Plaintiff's state law claims as authorized by 28 U.S.C. § l367(a).

4.     Venue is proper within this Judicial District pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred in the Southern District of New York.

## THE PARTIES

5.     Plaintiff Michelle Mazzaro ("Plaintiff") resides in Rockland County, New York and is a citizen of the United States.  At all times relevant to the Complaint, Defendants employed Plaintiff in Rockland, County New York, given that she worked remotely from her home.

6.     Upon information and belief, Defendant Cultural Care, Inc. d/b/a Cultural Care Au Pair is a corporation organized and existing under the laws of the State of Massachusetts and is authorized to do business in the State of New York. Upon information and belief, CCAP maintains its corporate offices at One Education Street, Cambridge, Massachusetts 02141.

7.     Upon information and belief, Defendant CCAP is a division of Defendant EF Education First, Inc., a corporation organized and existing under the laws of the State of California with a principal place of business at 2 Education Circle, Cambridge, Massachusetts 02141.  Internally, EF referred to CCAP, as well as its other divisions, as EF's "products."

8.      Upon information and belief, Defendant EF Intercultural Foundation, Inc. is a corporation organized and existing under the laws of the State of Massachusetts, with a principal place of business located at 2 Education Circle, Cambridge, Massachusetts 02141.

9.      Upon information and belief, Defendant Kristen Tanner ("Tanner") is a resident of the State of Massachusetts and at all times relevant to the Complaint was employed by the corporate Defendants.

10.     At all times relevant to the Complaint, Plaintiff was an "eligible employee" of Defendants within the meaning of 29 U.S.C. § 2611(2) in that Plaintiff was employed by Defendants for more than twelve months prior to the events underlying this lawsuit; was employed by Defendants for at least 1,250 hours during the 12 month period immediately preceding the commencement of the leave which underlies this lawsuit; and Defendants employed more than 50 employees within a 75 mile radius of Plaintiff's "worksite" as defined under the FMLA and its governing regulations.

11.     At all times relevant to the Complaint, Plaintiff suffered from a serious health condition within the meaning of 29 U.S.C. § 2611 (11).  Specifically, Plaintiff suffered a bimalleolar fracture of her ankle, a chronic condition that caused episodes of incapacity, required periodic doctor visits for treatment and continued over an extended period of time.

12.     At all times relevant to the Complaint, Defendants were employers within the meaning of 29 U.S.C. § 2611(4) in that they are engaged in an industry affecting interstate commerce and employed more than 50 employees for each working day during each of 20 or more calendar workweeks in the current and/or preceding calendar year.

13.     At all times relevant to the Complaint, Defendants were employers within the meaning of Human Rights Law § 292(5) and New York State Labor Law § 190(3).

14. At all times relevant to the Complaint, Defendant Tanner was an employer within the meaning of 29 U.S.C. § 2611(4) in that she acted in the corporate Defendants' interest as against Plaintiff and various other employees of the corporate Defendants.

## STATEMENT OF FACTS

15. Plaintiff commenced employment with Defendants in or about December, 2012. At that time, she was misclassified as an independent contractor. She held the "independent contractor" position through August 2015.

*Plaintiff's work performance was extraordinary*

16. In her contractor role, Plaintiff reported briefly to Tanner. Tanner was instantly impressed with her work and work ethic. In late 2014, Tanner told Plaintiff she would "love" for her to apply for a salaried program director ("PD") position. Plaintiff applied, was selected, and began reporting to Tanner in January, 2015. Her offer letter (on EF letterhead) stated that she was hired as a PD for CCAP, "a division of EF Education First." It also stated that her employment with "EF" was at-will. From January, 2015 through August, 2015, she was paid both on a 1099 and W-2 basis.

17. Tanner was transferred to a new region in late 2015. In early 2016, Plaintiff moved to that region to again report to Tanner. Tanner was "off the charts excited" and "literally beside herself" about Plaintiff reporting to her again. In noting their remarkable and lasting work relationship, Tanner exclaimed she and Plaintiff "have . . . FOREVAH! together."

18. When Plaintiff moved to her new region, the team there was in complete disarray and morale was very low. As Tanner described it, her "people were not happy" and Plaintiff would have to "wow them" to get things on track. Plaintiff did exactly that. At the end of August, 2016, Tanner praised Plaintiff's work performance in the new region. Tanner explained that her

cases "look great" and that she was "psyched." She exclaimed, "overall great management given the business!"

19. Similarly, in an October, 2016 oral feedback session, Tanner told Plaintiff she received the highest level of positive feedback from the Local Childcare Consultants ("LCC's") of anyone on the team. Recognizing she accomplished a very difficult turnaround in a relatively short period of time, Tanner praised her for a job well done.

20. Dan Sodervall, CCAP's President, was also effusive in terms of praise for Plaintiff's work performance. After the tragic night club shooting in Orlando, Florida, he praised her work efforts in a time of crisis and the total investment she had in the well-being of the au pairs in her territory.

21. Plaintiff was scheduled to take a short vacation in January, 2017. Just prior to her leaving, the team was extremely overloaded with work due to other employee vacations, resignations and travel. Plaintiff went above and beyond her duties to handle the issues as best she could before she left.

22. Just prior to Plaintiff leaving on vacation, Tanner expressly recognized her remarkable work efforts. She repeatedly thanked Plaintiff and wrote, "please never leave me!" To further demonstrate her gratitude, Tanner sent Plaintiff a handwritten note of appreciation and an American Express gift card for her to use while on vacation.

23. For her part, Amy Pond, CCAP's Vice Present and Tanner's direct superior, also provided strong praise. In January, she wrote to express a "big thank you" for Plaintiff's efforts in handling a difficult case, concluding "[w]e are so lucky to have you on our team." In September 2016, Pond profusely thanked Plaintiff for developing a team building idea, saying she loved Plaintiff's initiation of a team bonding opportunity and that the group "really seemed to jump on it!"

*Everything changes when Plaintiff is injured and takes medical leave*

24.     Unfortunately, on the last day of her vacation in Texas (January 16, 2017), Plaintiff fell and significantly injured her ankle.

25.     She immediately went to a local hospital and then quickly returned home for further medical evaluation.  As soon as she returned to New York, she notified Tanner of the injury.

26.     She was diagnosed with a left ankle bimalleolar fracture, lateral and posterior malleoli.  The injury required immediate surgery, known as an Open Reduction and Internal Fixation, whereby a plate and various unicortical/bicortical screws were inserted into her ankle.

27.     After the surgery she was kept in the hospital for observation.  Upon release, she was instructed to place no weight on her left ankle and was required to return to the doctor in two weeks for removal of surgical staples.

28.     As she explained to Tanner, her injury required at least six to eight weeks of intense rehabilitation and recovery.  After completing the requisite paperwork, Human Resources from EF approved Plaintiff for leaves under the FMLA and EF's short-term disability policy.

29.     Tanner was extremely upset that Plaintiff took medical leave.

30.     At the start of her leave, Tanner contacted Plaintiff often with work questions as well as to question her about her medical condition and doctor appointments.  It was clear to Plaintiff that Tanner was upset and annoyed and was trying to rush her back to work.

31.     Also at the start of her leave, Tanner informed Plaintiff that the Sales Directors, at their recent meeting, recognized Plaintiff's "fabulous" work performance and, in response, CCAP was offering her a trip to South Carolina.  Plaintiff said she need to first check with her surgeon, because she was unsure if she would be "on her feet" by then.  After checking with the doctor, she was forced to decline the trip given her physical condition.  Hearing this, Tanner responded with a dismissive, "too bad."

32.     After about three weeks on leave, and dismayed she was not back at work, Tanner continued prodding Plaintiff about her return.  When Plaintiff told Tanner she was unable to keep her leg down for even short periods without severe pain, Tanner said she would send Plaintiff a laptop so she could "work from bed."  At that time, Plaintiff was heavily medicated, was still in tremendous pain, and was in no condition to work.  She declined to accept the laptop, explaining to Tanner she was on leave and was simply unable to work.  Not only does Tanner's conduct amount to classic FMLA interference, it shows her distain for Plaintiff's medical condition and need for leave.

33.     Nonetheless, while on leave, Plaintiff continuously kept Tanner apprised of her medical appointments and her potential return date.

34.     Plaintiff returned from leave on April 6, 2017.  The retaliation was instantaneous.  In fact, Plaintiff thought she could be fired that day.  Tanner was openly antagonistic – her first words to Plaintiff were, "well, we never knew when *you* would be back" even though she (and HR) were kept apprised of her return date.   Tanner openly complained about being short-handed during Plaintiff's leave and how everyone was forced to cover for her, lamenting that this created a significant toll on the team.

35.     Tanner also warned Plaintiff, "I will never be caught with my pants down again."  Tanner then explained she was looking for a new PD and if Plaintiff wanted to look internally or externally for a new position, she would provide a "good reference."  Thus, unbeknownst to Plaintiff, the decision to fire her was apparently made while she was on leave, but was not to be implemented until the replacement was found.   Plaintiff was so upset about this conversation that it took her approximately 30 minutes to compose herself once it ended.

36.     Later that day, Tanner emailed Plaintiff with a list of specific tasks to be done that day, that week and the next week.  She set up a "touch base" for every day at 5:15pm, a not-so-subtle

form of harassment, to "keep tabs" on her.  Tanner also wrote that they were to pick up where they left off in terms of "identified areas for improvement."  This was in stark contrast to Tanner's pre-leave, effusive praise.  In any event, most times Tanner forgot about the TB's and had to be reminded.  Because they were nonsensical, the TB's eventually stopped.

37. Looking to manufacture performance "issues," Tanner claimed that Plaintiff did not "close the loop" on certain matters.  Many of those issues were not closed because Plaintiff took an emergency leave of absence.  In other instances, Tanner referenced cases that were closed for some time but now, after the fact, she purportedly had issues with those closures.  Again, Plaintiff was penalized for taking FMLA leave.

38. While Tanner was papering the file, Plaintiff continued to receive emails from host families praising her work efforts.  She also received an email from a LCC from Connecticut (her former territory) asking her to return as her PD because the existing PD was unacceptable.

39. Willing to do anything to save her position (and income), Plaintiff took Tanner up on her offer to look for position internally.  She applied for another CCAP work-from-home position.  After receiving no response to her application, Plaintiff followed up.  Again she received no response.  Plaintiff then asked Tanner to investigate.  Tanner reported back that the position had been "filled," yet Plaintiff knew the position was still open on the job board.

*Plaintiff is abruptly fired*

40. On June 20, 2017, Tanner told Plaintiff she found the new PD.  Concerned, Plaintiff asked if the new PD was hired to replace her and whether she would be fired once the new hire was trained.  Tanner said yes.  Plaintiff became completely distraught and took the next two days off.  Plaintiff knew it would take CCAP time to train the new employee, so she would have at least some buffer before she was fired.

41. As soon as she returned to work on the morning of June 23, 2017 -- just 56 work days after her leave ended -- Plaintiff was abruptly fired. She was never placed on a performance improvement plan and was never given any type of formal counseling notice. In fact, during her time at EF, she never received a written performance evaluation. By contrast, when one of Tanner's PD's was in fact underperforming (as opposed to Plaintiff, who was not), Tanner assigned a seasoned PD to sit with her, in her home office, for an entire week in an effort to improve that PD's performance.

42. As to the basis of the firing, Human Resources said only that Plaintiff had undefined "ongoing performance issues." Plaintiff later received a COBRA letter from EF, stating that her coverage under "EF Education First, Inc.'s benefit plan(s)" ended on June 30, 2017.

43. The reasons given for Plaintiff's firing are false and pretextual. In truth, Plaintiff's work performance was superior to the other PD's who were not disabled or who did not take leave.

### FIRST CAUSE OF ACTION
### FMLA — Interference

44. Plaintiff realleges and incorporates by reference paragraphs 1 through 43 of the Complaint as if fully set forth herein.

45. By the aforementioned actions, Defendants, separately and together, have interfered with, restrained and denied Plaintiff her rights under the FMLA, in violation of 29 U.S.C. §§ 2612(a), 2614(a) and 2615(a).

46. As a result of Defendants' violation of the FMLA, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment and loss of opportunity for advancement and promotion.

## SECOND CAUSE OF ACTION
### FMLA — Retaliation

47. Plaintiff realleges and incorporates by reference paragraphs 1 through 46 of the Complaint as if fully set forth herein.

48. By the aforementioned actions, Defendants, separately and together, have retaliated against Plaintiff for exercising her rights under the FMLA, in violation of 29 U.S.C. § 2615(a).

49. As a result of the retaliation engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment and loss of opportunity for advancement and promotion.

## THIRD CAUSE OF ACTION
### Disability Discrimination (Actual and Perceived)

50. Plaintiff realleges and incorporates by reference paragraphs l through 49 of the Complaint as if fully set forth herein.

51. At the time of her termination, Plaintiff was a qualified individual with an actual disability as defined by Human Rights Law § 292(21) who was able to perform the essential functions of her position in a reasonable manner with or without a reasonable accommodation.

52. Defendants also regarded and/or perceived Plaintiff as disabled (as defined by Human Rights Law § 292(21)) by virtue of her medical condition as alleged above.

53. Defendants terminated Plaintiff because of her actual or perceived disability.

54. Plaintiff was qualified to (and did) perform the essential functions of her position, with or without reasonable accommodation. By the aforementioned actions, Defendants, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of her employment, on the basis of her actual or perceived disability, in violation of the Human Rights Law § 296(1).

55. As a result of the discrimination engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## FOURTH CAUSE OF ACTION
### Aiding and Abetting Disability Discrimination (Actual and Perceived)

56. Plaintiff realleges and incorporates by reference paragraphs 1 through 55 of the Complaint as if fully set forth herein.

57. At the time of her termination, Plaintiff was a qualified individual with an actual disability as defined by Human Rights Law § 292(21) who was able to perform the essential functions of her position in a reasonable manner with or without reasonable accommodation.

58. Defendants regarded and/or perceived Plaintiff as disabled (as defined by Human Rights Law § 292(2l)) by virtue of her medical condition as alleged above.

59. Defendants terminated Plaintiff because of her actual or perceived disability.

60. Plaintiff was qualified to (and did) perform the essential functions of her position, with or without reasonable accommodation.

61. By the aforementioned actions, Defendants, separately and together, have aided and abetted discrimination against Plaintiff in the terms, conditions, and privileges of her employment, on the basis of her actual or perceived disability, in violation of the Human Rights Law § 296(6).

62. As a result of the aiding and abetting engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## FIFTH CAUSE OF ACTION
### Failure to Provide Notice of Pay

63. Plaintiff realleges and incorporates by reference paragraphs 1 through 62 of the Complaint as if fully alleged herein.

64. Upon information and belief, Defendants failed to provide notice to Plaintiff of her rate of pay and the basis of her wage payment, as set forth in § 195 of the Labor Law.

65. Upon information and belief, Plaintiff did not receive such notice and not sign a written acknowledgement.

66. Defendants, by the above omissions, have violated Labor Law § 195.

67. Among other things, Defendants, jointly and severally, are subject to civil penalties for each week of non-compliance.

WHEREFORE, Plaintiff demands that judgment be entered in her favor and that the Court order and award Plaintiff the following relief against Defendants:

- A. Damages in the form of (i) back pay with interest based on Plaintiff's appropriate compensation had her rights under the FMLA not been violated and had she not been discriminated and/or retaliated against; and (ii) front pay;
- B. Compensatory damages for her emotional pain and suffering, mental anguish, distress, humiliation, and loss of reputation in an amount to be determined at trial;
- C. Punitive damages in an amount to be determined at trial;
- D. Liquidated damages;
- E. Civil Penalties;
- F. Attorney's fees;
- G. Costs and disbursements;
- H. Interest; and
- I. Such other and further relief as this Court may deem just and proper.

DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury as to all issues in the above matter.

Dated: New York, New York
November 6, 2018

Respectfully submitted,

CARABBA LAW FIRM P.C.

By: /s/ Anthony Carabba, Jr.
_____
Anthony Carabba, Jr.
85 Worth Street, 3rd Floor
New York, New York 10013
212.430.6400
acarabba@carabbalaw.com

*Counsel for Plaintiff*